# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Clarissa W.-J.,

        Plaintiff,

v.

Martin J. O'Malley, Commissioner
of Social Security Administration,

        Defendant.

Case No. 23-cv-729 (ECT/ECW)

**REPORT AND RECOMMENDATION**

---

This matter is before the Court on Plaintiff Clarissa W.-J.'s Complaint seeking judicial review of a final decision by the Commissioner denying her application for disability insurance benefits. (*See generally*, Dkt. 1.) The parties have filed briefs "present[ing] for decision" Plaintiff's request for judicial review of the final decision of the Commissioner of Social Security ("the Commissioner").[1] (*See* Dkts. 16, 18, 19.) This case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons stated below, the Court recommends that Plaintiff's request for reversal or remand of the Commissioner's decision (Dkt. 16) be granted and the Commissioner's request that the Court affirm the Commissioner's decision (Dkt. 18) be denied.

---

[1] As of December 1, 2022, Social Security Actions under 42 U.S.C. § 405(g) are "presented for decision on the parties' briefs," rather than summary judgment motions. Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g), Rule 5.

# I.    PROCEDURAL BACKGROUND

According to certain records, on January 3, 2019, Plaintiff and the Social Security Administration ("SSA") completed her application for Disability Insurance under Title II of the Social Security Act ("the Act") and on April 12, 2019, Plaintiff also applied for Supplemental Security Income Benefits under Title XVI of the Act.[2]  (R. 685, 692.)[3] Both applications alleged disability as of November 1, 2018 (R. 685, 692), but at some point, her alleged onset date was amended to August 30, 2018 (*see* R. 14 ("The claimant is alleging disability since August 30, 2018.")).  Her applications were denied initially and on reconsideration.  (R. 337-54, 355-72, 377-95, 396-414.)

Plaintiff requested a hearing, and on July 21, 2020, Plaintiff appeared remotely for a hearing before Administrative Law Judge Corinne T. McLaughlin ("ALJ McLaughlin").  (R. 471-72, *see* R. 296-322 (transcript).)  The ALJ issued an unfavorable decision on August 17, 2020, finding Plaintiff was not disabled.  (R. 419-44.)  On May 10, 2021, the Appeals Council remanded the case to ALJ McLaughlin for the following reasons: the ALJ's decision did not "adequately evaluate the claimant's sleep disorder of insomnia," or adequately evaluate a treating source medical opinion completed by Rori, Johnson, Psy.D in relation to Plaintiff's insomnia and its effects on Plaintiff's mental health limitations.  (R. 445-52.)  ALJ McLaughlin held a subsequent hearing on October

---

[2]    Other records indicate Plaintiff applied under Title II on August 30, 2019 (R. 356) and under Title XVI on March 12, 2019 (R. 338), but it does not matter for purposes of this decision.

[3]    The Social Security Administrative Record ("R.") is available at Dkt. 11.

6, 2021 and called a vocational expert, Jo Gulley Ancell, ("VE Ancell") as a witness.  (R. 268-95.)  Administrative Law Judge Mary Morrow ("ALJ Morrow") then held a supplemental hearing to complete testimony from another vocational expert, Heather Mueller ("VE Mueller") on February 24, 2022.  (R. 323-36.)  ALJ Morrow issued an unfavorable decision on March 17, 2022.  (R. 11-45.)

Following the five-step sequential evaluation process under 20 C.F.R. §§ 404.1520(a) and 416.920(a),[4] the ALJ first determined at step one that Plaintiff had not engaged in substantial gainful activity since August 30, 2018, the alleged onset date of disability as of the date of the ALJ's opinion.  (R. 17.)

At step two, ALJ Morrow determined that Plaintiff had the following severe impairments: "degenerative disc disease of the lumbar, thoracic, and cervical spine; asthma; migraines; pseudo-seizures; insomnia; fibromyalgia; obesity; bipolar disorder; panic disorder; generalized anxiety disorder (GAD); borderline personality disorder

---

[4]    The Eighth Circuit described this five-step process that the Commissioner of Social Security must use as follows:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant's impairments are so severe that they significantly limit the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has impairments that meet or equal a presumptively disabling impairment specified in the regulations; (4) whether the claimant's [residual functional capacity ("RFC")]  is sufficient for her to perform her past work; and finally, if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that (5) there are other jobs in the national economy that the claimant can perform given the claimant's RFC, age, education and work experience.

*Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).

(BPD); autism spectrum disorder (ASD); attention deficit hyperactivity disorder (ADHD); and post-traumatic stress disorder (PTSD)."  (R. 17.)  ALJ Morrow acknowledged that Plaintiff had been treated for histoplasmosis, urinary tract infection, and ankle sprain/peroneal tendinitis, but concluded that they were "non-severe medically determinable impairments for the purposes of this decision" because none were durationally severe impairments that would be expected to last for 12 months.  (R. 18.)

At step three, ALJ Morrow found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1.  (R. 19.)

At step four, after reviewing the entire record, ALJ Morrow concluded that Plaintiff had the following residual functional capacity ("RFC"):

> [T]o perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the following limitations: occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; and frequently reach, handle, finger, and feel with the bilateral upper extremities. She requires the ability to alternate between standing and sitting every thirty minutes for one to two minutes in the immediate vicinity of the work station. She can work in an environment with no more than a moderate noise level (as defined by The Selected Characteristics of Occupations); but can never be exposed to concentrated levels of extreme heat, extreme cold, fumes, odors, dusts, gases, poor ventilation, or other pulmonary irritants. She can never be exposed to flashing lights, strobe lighting, or hazards such as moving machinery, unprotected heights or commercial driving. She can perform simple, routine, and repetitive tasks, but not at a production rate pace, so for example, no assembly line work; and can respond appropriately to occasional, superficial interaction with supervisors, co-workers and the general public (with superficial defined as interaction limited to supervisory or instructional matters). However, the individual is able to interact sufficiently to complete a 30-day training period. She can tolerate few changes in the work setting, defined as routine job duties that remain static and are performed in a stable, predictable work environment.

(R. 24-25.)  ALJ Morrow found that Plaintiff was unable to perform any past relevant work.  (R. 35.)

However, at step five, ALJ Morrow found that given Plaintiff's age, education, work experience, and RFC, Plaintiff would have been able to perform the requirements of occupations such as: Circuit Board Assembler, Dictionary of Occupational Titles ("DOT") 726.684-110; Address Clerk DOT 209.587-010; and Document Preparer DOT 249.587-018.  (R. 36.)

ALJ Morrow concluded that Plaintiff "has not been under a disability, as defined in the Social Security Act, from August 30, 2018, through the date of this decision [March 17, 2022] (20 CFR 404.1520(g) and 416.920(g))."  (R. 37.)

Plaintiff requested review of the decision, and the Appeals Council denied Plaintiff's request for review, which made the ALJ's decision the final decision of the Commissioner.  (R. 1-7.)  Plaintiff then commenced this action for judicial review.

The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties.  The Court will recount the facts of record to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions.

## II.    RELEVANT RECORD

Plaintiff was receiving Adult Rehabilitative Mental Health Services ("ARMHS") from August 2017 through January 2018, from Sarah Haberman, MSW, LGSW for Major Depressive Disorder, PTSD, and anorexia nervosa.  (R. 1860-71.)  Notes from sessions in August to October 2017 show that Plaintiff was working toward consistently

taking her medications and was trying to manage her PTSD and depression and "use coping skills to better get along with her boyfriend, peers, and coworkers." (R. 1868-71.) At these appointments Plaintiff presented as "open and engaged," "engaged, alert, and motivated," and "energetic and moving." (R. 1865-71.)

In a November 2017 ARMHS functional assessment, Plaintiff admitted that she was sporadically taking her medications, not attending her mental health appointments, working at a casino but not always showing up due to no motivation to get out of bed. (R. 1862.) She reported enjoying work and doing well at work when she attended. (R. 1862.) At that assessment, Plaintiff reported that she "just [doesn't] like people," that she stays in the house because she liked and could get along with the people she lived with, and that she does not participate in activities "outside of work." (R. 1863.) Plaintiff stated that relationships with people were hard for her and that her difficulty communicating made it "easier for her to isolate." (R. 1863.) In November and December 2017, Plaintiff stopped attending appointments regularly and when she did, she presented as engaged but "sad." (1857-62.) Notes from a January 2018 therapy session show that when Plaintiff started taking her medications again, she was calmer, more relaxed, engaged, and open. (R. 1854.)

Plaintiff started seeing a different therapist, Brenda Quall, BA through ARMHS in February 2018. (R. 1851.) Ms. Quall stated at a session that Plaintiff presented as "talkative and open about her triggers and history." (R. 1851.) Plaintiff continued to see Ms. Quall and on February 26, 2018, Plaintiff commented that she lost her job, but had applied for unemployment the same day. (R. 1847.) At another session on April 2, 2018,

Plaintiff commented on getting a new job at a laundry, but then two weeks later reported that she only worked at the laundry for a week because of an allergic reaction.  (R. 1840, 1842-43.)  Later in April 2018 an ARMHS nurse conducted an updated assessment of Plaintiff clarifying the chronic PTSD and depression diagnosis.  (R. 1838.)  She conducted a mental status exam showing that: Plaintiff's affect and mood were appropriate and pleasant; her mood was stable with panic attacks; she was fully cooperative, oriented, and consistent; she had good attention but poor long- and short-term memory; she had fair insight and judgment; and she had logical, coherent, but also racing thoughts.  (R. 1836-37.)

Plaintiff's May 23, 2018 mental status exam, conducted by Brad Johnson through ARMHS, showed that Plaintiff was oriented to time, person, place, and situation; was well groomed and had normal eye contact; had normal rate and rhythm of speech; had a cooperative attitude, an anxious mood, and appropriate affect; and had logical thought content and focused attention span/concentration.  (R. 1829.)  On June 5, 2017, Plaintiff again saw Ms. Quall and related, among other things, that she had "difficulty working" and related "issues with some coworkers in meetings" (R. 1825), "that she ha[d] been spending time with her family out of state, and her grandmother," and that she had a friend but that her limited funds due to her inability to work "limit[ed] socializing in the community."  (R. 1824.)

At an August 13, 2018 ARMHS appointment, Plaintiff reported that she stopped taking her medications again but that she would "start taking them again tomorrow."  (R. 1815.)  Plaintiff continued to receive ARMHS services through August 2019, with

reports of her presentation during that time generally showing Plaintiff to be "pleasant and cooperative." (R. 1763, 1785, 1797, 1800, 1804, 1805, 1809, 1810, 1811, 1812, 1815, 1816, 1817.)

During a December 2018 assessment, Plaintiff reported the following about her social life:

> Plaintiff makes pillows, reads, writes, and states that she has one friend here in MN who lives down the hall from her. Plaintiff moved to MN in 2013 when she entered 9th grade. She states that she "was the weird kid." Plaintiff states that she is not interested in finding new/more friends. She says she tried for a long time to build friendships but it always ended with getting hurt in the relationship. She says she gives up on finding friends. She feels like she has a good support system.

(R. 1807.)

Plaintiff's May 3, 2019 mental status exam showed that she was oriented to time, person, place, and situation; she had normal eye contact and she was well groomed; she had a normal rate and rhythm of speech; her attitude was cooperative and her mood and affect were normal and appropriate; her thought content was logical and her attention span/concentration were focused. (R. 1789.) Also on May 3, 2019, Plaintiff reported working as a babysitter for two children, but that other than her grandmother, her support system was "nonexistent." (R. 1788.) By May 22, 2019, Plaintiff reported that she was no longer babysitting. (R. 1783.) Her June 18, 2019 mental status exam showed that she had an appropriate and pleasant mood and affect; her mood was also stable but with panic attacks, and she was fully cooperative, oriented, and consistent. (R. 1775.) In August 2019 Plaintiff travelled to Arizona for a week to visit family. (R. 1763.)

Plaintiff was diagnosed by James Molberg, MA, LP in October 2018 with the following mental health diagnoses, PTSD, Bipolar II Disorder, Panic Disorder, Attention-Deficit/Hyperactivity Disorder (ADHD). (R. 919.) At that evaluation, Plaintiff's mental status exam showed that she had a depressed mood but appeared well-groomed, cooperative, with appropriate affect and normal speech; she was fully oriented with logical and goal directed thought processes; her thought content was appropriate to mood and circumstances; she had intact judgment and good insight, with no perceptual disturbances; and she had relaxed and calm motor activity. (R. 916.) Mr. Molberg recommended further services for Plaintiff including individual psychotherapy, travel, case management, psychiatric evaluation, medication management, and ARMHS. (R. 920.)

In November 2018 Plaintiff was diagnosed by Jody Schoenecker, APRN, CNP, with ADHD, PTSD, Borderline Personality Disorder, and panic disorder. (R. 943.) Plaintiff's mental status exam from that visit showed appropriate dress; obesity; cooperative behavior and good eye contact; normal rate, amplitude, and prosody for speech; sad/depressed and anxious mood; restricted range and sad/depressed affect; goal oriented and organized thought process; future oriented, no suicidal ideation, poor confidence/esteem, poor body image as to thought content, with ruminations; poor to fair insight; alert and awake consciousness; intact recent and remote memory; intact attention/concentration; intact language as to naming and repeating phrase with abstract language also indicated; and an average fund of knowledge. (R. 942.) Plaintiff saw Nurse Schoenecker again in December 2018 and January 2019. (R. 925-36.) During

these appointments, Nurse Schoenecker discontinued Plaintiff's Vraylar (cariprazine)[5], added Seroquel (quetiapine)[6], and kept Plaintiff on prazosin[7].  (R. 925, 930.)

Plaintiff's mental status exam from the December 2018 visit showed appropriate dress; obesity; cooperative behavior and good eye contact; normal rate, amplitude, and prosody for speech; sad/depressed and anxious mood; restricted range and sad/depressed affect; goal oriented and organized thought process; future oriented, no suicidal ideation, poor confidence/esteem, and poor body image as to thought content, with ruminations; fair insight; alert and awake consciousness; intact recent and remote memory, intact attention/concentration; intact language as to naming and repeating phrase with abstract language also indicated; and an average fund of knowledge.  (R. 932.)  Plaintiff's mental status exam from a January 2019 visit showed appropriate dress; adequate grooming and hygiene; obesity; cooperative behavior and good eye contact; normal rate, amplitude, and prosody for speech; sad/depressed and anxious mood; restricted range and sad/depressed affect; goal oriented and organized thought process; future oriented, no suicidal ideation, poor confidence/esteem, and poor body image thought content with ruminations; fair insight; alert and awake consciousness; intact recent and remote memory, intact

---

[5]    Capriprazine (Vraylar) is a medication used to treat bipolar disorder. https://www.ncbi.nlm.nih.gov/books/NBK602702/ (last visited July 10, 2024).

[6]    "Quetiapine is FDA approved for schizophrenia, acute manic episodes, and adjunctive treatment for major depressive disorder. Quetiapine is also used for several non-FDA-approved indications, such as generalized anxiety disorder." https://www.ncbi.nlm.nih.gov/books/NBK459145/ (last visited July 10, 2024).

[7]    Prazosin is a medication used to treat PTSD-associated nightmares. https://www.ncbi.nlm.nih.gov/books/NBK555959/ (last visited July 10, 2024).

attention/concentration; intact language as to naming and repeating phrase with abstract language also indicated; and an average fund of knowledge. (R. 927.)

Also in 2018, Selena Stevens, MA, MHO (supervised by Felicia O'Brien, MA, LMFT) assessed Plaintiff. (R. 1632-36.) Plaintiff's mental status exam from that visit showed that she had a disheveled appearance; agitated and alert activity level; and normal, rapid, and excessive speech. (R. 1633.) Her stream of consciousness was rambling and easily derailed; she was friendly and cooperative; her thought process contained a flight of ideas and she made loose associations; her thought content was within normal limits; her affect was appropriate and her mood was anxious and irritable; she had intact memory and orientation; her insight was moderate; and she was a poor historian, meaning she often changed the details of her story and had difficulty remembering timelines. (R. 1633-34.) Therapist Stevens diagnosed Plaintiff with bipolar disorder and PTSD. (R. 1635.) Therapist Stevens noted that a November 2018 World Health Organization Disability Assessment Schedule 2.0 (WHODAS 2.0) showed that at that time, Plaintiff's general disability score was moderate and that she had moderate to severe difficulty in getting along with others, moderate difficulty in understanding and communicating, moderate difficulty participating in society, moderate difficulty doing household activities, mild to moderate difficulty getting around, and no difficulty with self-care. (R. 1636.) Therapist Stevens developed a treatment plan for Plaintiff on December 12, 2018 and had another session with Plaintiff that same day. (R. 1637-39.) Plaintiff saw Therapist Stevens again in January 2019 (R. 1640) and then decided to

transfer her care to another therapist, but Plaintiff "did not contact [the referral therapist] for services." (R. 1641.)

Also in January 2019, Plaintiff saw William Meller, MD who assessed Plaintiff and diagnosed her with "[b]ipolar by history, borderline personality disorder, somatic symptom disorder and history of posttraumatic stress disorder." (R. 966.) Plaintiff's mental status exam from that visit indicated that she was pleasant, cooperative, with a good mood and full and appropriate affect "with occasional nervous laughter." (R. 966.) Plaintiff's speech was coherent and goal oriented, her associations were "tight," her thoughts processes were logical and linear, her thought content was without psychosis of suicidal ideation. (R. 966.) Her recent and remote memory, concentration, fund of knowledge, and use of language appeared to be at baseline, and she was alert and oriented with "somewhat guarded" insight and judgment. (R. 966.)

In March 2019, Plaintiff was admitted to inpatient services for mental health crisis stabilization, and she stayed until she was discharged in April 2019 with a diagnosis for PTSD, in part because of domestic violence that she had experienced in the past and recently. (R. 1610.) Plaintiff was to continue therapy in outpatient services. (R. 1610.) At a March 21, 2019 assessment, Plaintiff 's mental status exam results were as follows: she appeared well-groomed; she was cooperative and her speech was normal; she had calm motor activity and had no hyperactivity or impulse control problems; her affect was broad and her mood was euthymic; she was moderately depressed and had mild to moderate social withdrawal; she had moderate anxiety, no obsessive thinking, intact thought processes, no hallucinations or delusions; she was fully oriented with intact

memory; she had moderately impaired judgment and insight; and had average estimated intellectual ability.  (R. 1621.)  Plaintiff was "cooperative and engaged during the assessment" but noted that she lacks social support that lives close to her and that her grandmother, who lived in the same building was not a "good" support for her.  (R. 1622.)

Later in March 2019, Plaintiff took a trip to Washington to see her friends to "help her feel connected to other people again and give her a sense of trust that she has struggled to maintain with others," "decompress from all of the stress and trauma she has recently endured," and "think about how she can handle and manage stress differently when she comes back."  (R. 1612, 1620.)  A January 2019 letter from HealthPartners to Plaintiff's primary care provider at Fairview Clinics Wyoming noted that Plaintiff was on the "Restricted Recipient Program" for using health services that were not needed or using health services in a way that cost more than they should have, and that Plaintiff's restriction began in September 2017 and would be reviewed for possible renewal in September 2019.  (R. 1970.)  Plaintiff was renewed on the Restricted Recipient Program from September 2019 until further review in September 2022.  (R. 1978.)

In April and May 2019, Plaintiff saw Rori Johnson, PsyD, LP for outpatient services.  (R. 1602-09.)  On April 15, 2019, Dr. Johnson assessed Plaintiff's mental health status as verbal and articulate, with coherent and logical thoughts, an intact thought process, and euthymic mood and affect.  (R. 1602.)  On April 22, 2019, Dr. Johnson noted the following results from a mental health status exam of Plaintiff: a calm and cooperative attitude; no behavior difficulties; spontaneous and fluent speech; reactive

and mood congruent; affect and euthymic mood; goal-directed and logical thought process; and her thought content consisted of past relationships and "the manner in which she has been hurt." (R. 1603.) She had no hallucinations or delusions; intact memory/concentration; and good insight, judgment, and motivation. (R. 1603.) On May 2, 2019, Plaintiff's mental health status exam showed she was alert and verbal and that, although Plaintiff was watching a newborn child for a friend, she appeared to "do her best with her attention divided between" the session and her childcare responsibilities. (R. 1604.) "Her mood was reported to be 'tired," with affect observed as congruent. There was no mood lability, irritability, noticeable anxiety or distress. Thought content and thought processes appeared organized and pertinent to her two issues identified this session." (R. 1604.) Plaintiff's May 10, 2019 mental health status exam showed Plaintiff had a calm and cooperative attitude and no behavior difficulties; spontaneous and fluent speech; reactive and mood congruent affect; euthymic mood; goal-directed and logical thought process with thought content about her relationships and their impact on her sense of self; no hallucinations or delusions with memory and concentration intact; and good insight, judgment, and motivation. (R. 1605.) Plaintiff's mental health status exam results on May 24, 2019 and May 31, 2019 were the same as the May 10, 2019 assessment. (R. 1607, 1608.)

In the summer of 2019, Dr. Johnson listed the following as Plaintiff's mental health diagnosis: PTSD, autism spectrum disorder, major depressive disorder, generalized anxiety disorder, and ADHD. (R. 1922.) In June 2019, Plaintiff's mental health status during a visit with Dr. Johnson had the following results: appropriate attire, appeared

stated age, and no dysmorphia; cooperative behavior towards the examiner; restless motor activity; normal motor function, muscle tone, coordination and no tics, seizure activity, or abnormal movements; avoidant eye contact; euthymic mood; affect congruent with content of speech; unremarkable/fluent speech language; distractable attention; unremarkable concentration and thought process; and unremarkable thought content. (R. 1930.) She was oriented; displayed no evidence of impairment with memory or judgment; and demonstrated adequate insight and average intelligence as well as normal frustration tolerance. (R. 1931.) Dr. Johnson commented:

> [Plaintiff] arrived on time, with paperwork completed. As she has worked with this provider in the recent past, there was no difficulty with her comfort or level of participation throughout. She was verbal throughout, with a willingness to engage, answer questions, and hold a conversation. There were mild articulation errors evident in her expressive speech. Her thought processes were goal-directed and logical without evidence of disorganization of thought. Thought content was appropriate to the situation. Memory functions appeared intact for immediate and recent memories, however, remote memories appeared to have a quality of confabulation, with memory errors evident in her storytelling on this date from what she has reported previously. as evidenced by differing content stated in the EGGS crisis assessment document, the TSA document, and from what she has verbally reported to this provider on other occasions.

(R. 1931.)

On July 11, 2019, Dr. Johnson assessed Plaintiff's mental health status as: open and cooperative attitude; no difficulties initiating and holding a conversation, however, frequently distracted by her cat; speech was spontaneous and fluent; affect reactive and mood congruent; mood euthymic; thought process was goal-oriented and logical as well as clear/understandable; no obvious disturbances in thought content; no hallucinations or delusions; short and long term memory/concentration intact; and fair insight/judgment.

(R. 2400.) Plaintiff's July 16, 2019 mental health status was: open and cooperative attitude; no behavior difficulties, could initiate and hold conversation; spontaneous and fluent speech; reactive and mood congruent affect with euthymic mood; goal-directed and logical and clear/understandable thought process; no obvious disturbances in thought content; no hallucinations or delusions; short and long term memory/concentration intact; fair insight/judgment; and good motivation. (R. 2402.) Plaintiff's July 30, 2019 mental status exam was "within normal limits," "verbal throughout," and "no difficulties with engagement." (R. 2403.) Her August 6, 2019, and August 22, 2019, mental health status assessments by Dr. Johnson also indicated within normal limits. (R. 2404, 2405.)

Her September 5, 2019 mental health status exam with Dr. Johnson indicated: open and cooperative attitude; no behavior difficulties; could initiate and hold conversation; spontaneous and fluent speech; reactive and mood congruent affect with euthymic mood; goal-directed and logical and clear/understandable thought process; no obvious disturbances in thought content; no hallucinations or delusions; short and long term memory/concentration intact; fair insight/judgment, good motivation; and her PHQ-9[8] score was 14. (R. 2406-07.) Plaintiff's September 20, 2019 mental health status exam was the same as her September 5, 2019 exam except that her PHQ-9 score decreased from 14 to 13. (R. 2408.) Plaintiff's September 23, 2019 mental health assessment was the same as the two prior except that Dr. Johnson noted a lisp in Plaintiff's speech and

---

[8]    The Patient Health Questionnaire ("PHQ-9") score is a depression screening tool. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1495268/ (last visited July 10, 2024). A score of 5-9 indicates mild depression, 10-14 indicates moderate, 15-19 indicates moderately severe, and 20-27 indicates severe. *Id.*

her PHQ-9 score rose from a 13 to a 19.  (R. 2409.)  Plaintiff's September 27, 2019 mental status exam was the same as the prior except Dr. Johnson noted Plaintiff was yawning throughout and her PHQ-9 score fell from 19 to 16.  (R. 2410-11.)

Plaintiff's October 8, 2019 mental status exam was within normal limits (R. 2412), and her October 22, 2019 mental status exam showed: "Affect: personable and friendly. Mood: euthymic. Appearance: casual. Orientation: x4. Self-esteem: confident. Thought Process: intact: logical connections. Thought Content: no disturbances of thought. Speech: candid" (R. 2413).  Plaintiff's October 31, 2019 mental status exam showed: "Affect personable and friendly. Mood; euthymic, despite report of being in pain because of fibromyalgia. Appearance: casual. Orientation: x4. Self-esteem: no difficulties. Thought Process; intact; logical connections. Thought Content: no disturbances of thought. Speech: open, exploratory, candid."  (R. 2414.)

Plaintiff's November 8, 2019 mental status exam showed: calm and cooperative attitude; no behavior difficulties, could initiate and hold conversation; spontaneous, fluent, clear with no verbal difficulties in speech; euthymic, reactive, and mood congruent affect, "ok" mood; goal-directed and logical, clear/understandable thought process; no obvious disturbances of thought content; no "SI/HI"; no hallucinations or delusions; short and long term memory intact; and good insight/judgment and motivation. (R. 2415.)  Plaintiff's November 15, 2019 mental status exam was the same as the previous except that Plaintiff's mood changed from "ok" to "let me tell you" and her PHQ-9 score was a 23.  (R. 2416-17.)

Plaintiff's December 10, 2019 mental status exam stated: "Affect personable and friendly. Mood: euthymic, despite report of feeling irritable with the two situations identified this session. Appearance: casual. Orientation: x4. Self-esteem: no difficulties. Thought Process: intact; logical connections. Thought Content: no disturbances of thought. Speech: open, exploratory, candid." (R. 2418.) Plaintiff's December 17, 2019 mental status exam stated: "Affect: congruent with stated mood. Mood: tired. Appearance: dressed in PJs. Orientation: x4 once alert. Self-esteem: no difficulties. Thought Process: intact; logical connections. Thought Content: no disturbances of thought. Speech: open, exploratory, candid." (R. 2419.) Plaintiff's December 27, 2019 mental status exam stated "Appearance: casual, seeming underdressed with bra and camisole evident. Attitude: Open and cooperative, Behavior: Willing to engage. Affect: congruent with stated mood. Mood: tired. Orientation: x4, seeming oriented. Self-esteem: no difficulties. Thought Process: intact: logical connections. Thought Content: no disturbances of thought. Speech: open, exploratory, candid. Insight/Judgment Able to anticipate outcomes and learn from experiences." (R. 2420.)

Plaintiff's December 31, 2019 mental status exam showed:

> Appearance: casual, seeming dressed in night clothes. Attitude: Open end cooperative, friendly. Behavior: Willing to engage. Often observed to walk around apartment as session is going on. Affect: congruent with stated mood. Mood: euthymic. Orientation: x4, seeming oriented. Self-esteem: no difficulties. Thought Process: intact; logical connections. Thought Content: no obvious disturbances of thought. Speech: open, exploratory, candid. Insight/judgment: Able to anticipate outcomes and learn from experiences.

(R. 2421.) Plaintiff's January 7, 2020 mental status exam results were as follows: she appeared casual and clean; she had an open and motivated attitude; she exhibited no

behavior difficulties, she could initiate and hold conversation; her speech was spontaneous, fluent, and clear; she had full affect; and, as to her mood, she reported feeling depressed. (R. 2422-23.) Her thought process was goal-directed and logical, clear/understandable, coherent, and concrete; her thought content displayed no obvious disturbances of thought with no SI/HI; there was no evidence of hallucinations, delusions, depersonalization, or derealization; she was alert and oriented; her short and long term memory were intact; she had sufficient attention and concentration; she had good insight/judgment; she was able to anticipate outcomes and able to learn from experiences; she showed good motivation; and her PHQ-9 score was 18. (R. 2423.)

    Plaintiff's January 24, 2020 mental status exam showed:

    MSE; WNL. Despite observed to be lying in her bed, with blankets covering her, [Plaintiff] was verbal throughout. Her attitude was open and cooperative, seeming to become enthused when discussing the Non-24-Hour Sleep-Wake type of a circadian disorder. Mood and affect congruent, appearing to be euthymic. No difficulties with engagement or following through with the conversation. No difficulties were noted with thought content thought processes, memory, or concentration. Insight and Judgment this session appeared linked to her need to find a disorder that could explain her difficulties with her sleep-wake pattern.

(R. 2424.)

    Plaintiff's January 31, 2020 mental status exam stated:

    MSE: Appearance: casual. Her attitude was open and cooperative. Mood and affect congruent, appearing to be euthymic. No difficulties with engagement or following through with the conversation. No difficulties were noted with thought content. thought processes, memory, or concentration. Insight and judgment appeared to be intact, as exhibited by [Plaintiff's] ability to recognize thoughts and emotions and her motivation to explore that in therapy.

(R. 2425.)

19

Plaintiff's February 14, 2020 mental status exam showed:

MSE: Appearance: casual. Her attitude was open and cooperative. Mood and affect congruent, appearing to be euthymic, despite her report of injury, pain and financial stressors. No difficulties with engagement or following through with the conversation; able to stay focused without any apparent dissociative experiences, No difficulties were noted with thought content, thought processes, memory, or concentration. Insight and judgment appeared to be intact, as exhibited by [Plaintiff's] ability to recognize aspects of her past and ways that her past influences her present, able to discuss and work through in therapy.

(R. 2426-27.)

Plaintiff's March 3, 2020 mental status exam showed:

[Plaintiff] was alert and attentive. Attire casual. Attitude open and cooperative. Willing to discuss presenting problem and focus on topic. Affect reactive and mood congruent. Mood generally relaxed, but focused on stressors. Thought Process goal-directed and logical; clear/understandable. Thought content no obvious disturbances in thought. No evidence of hallucinations, delusions, depersonalization, or derealization. No evidence of memory dysfunction. No dissociation. Insight/Judgment good, Motivation: Good.

(R. 2428.)

Plaintiff's March 10, 2020 mental status exam stated:

[Plaintiff] was alert and attentive. Attire casual. Attitude open and cooperative. Willing to discuss presenting problem and focus on topic. Affect reactive and mood congruent. Mood generally relaxed, but focused on what she anticipates experiencing with her mother's visit. Thought Process goal-directed and logical; clear/understandable. Thought content no obvious disturbances in thought. No evidence of hallucinations, delusions, depersonalization, or derealization. No evidence of memory dysfunction. No dissociation. Insight/Judgment good. Motivation: Good.

(R. 2429.)

Plaintiff's March 27, 2020 mental status exam showed:

Client was seen via telehealth. She was casually dressed and appropriately groomed. Attitude was open end cooperative. Mood was euthymic, with affect reactive and congruent to the topic of conversation. Eye contact was within normal limits, as could be determined from the telehealth connection. Speech was normal for rate, tone and volume, without pressure. Thought processes were goal-directed and logical. Thought content was negative for any delusions, phobia, worries, ruminations, obsessions or compulsions, or for any SI or HI. There was no evidence of any perceptual disturbances. Memory and concentration appeared intact. Insight and judgment appear to be intact, as exhibited by the client's ability to stay focused on what she wanted to convey this session, staying present, with an ability to recognize thoughts and emotions and how her past Is connected to her present.

(R. 2430.)

Plaintiff's April 7, 2020 mental status exam stated:

Client was seen via telehealth. Only [Plaintiff]'s face was seen this session, so no observations could be made of her attire or grooming. Attitude was open and cooperative. Mood was euthymic, with affect reactive and congruent to the topic of conversation. Eye contact was within normal limits, as could be determined from the telehealth connection. Speech functions were appropriate for tone, volume, rate, and fluency, with no evidence of pressured patterns or of any expressive or receptive language dysfunction. Thought processes were intact, goal oriented, logical, and well-organized. Thought content revealed no evidence of delusions. obsessions. Rumination, grandiosity, suspiciousness, phobia, paranoia, negativistic thinking or for any SI or HI. There was no evidence of any perceptual disturbances. Memory functions were intact with respect to immediate, recent and remote memories. Attention and concentration were without obvious impairment. Insight and judgment appeared to be intact, as exhibited by the client's ability to stay focused on what she wanted to convey this session. with an ability to recognize thoughts and emotions and aspects of her functioning she wishes to explore and change.

(R. 2431.)

Plaintiff's April 17, 2020 mental status exam results showed:

Client was seen via telehealth. Only [Plaintiff]'s face was seen this session, so no observations could be made of her attire or grooming. Her attitude was open and cooperative. Mood was euthymic, with affect reactive and congruent to the topic of conversation. Eye contact was within normal limits,

CASE 0:23-cv-00729-ECT-ECW   Doc. 23   Filed 07/10/24   Page 22 of 48

as could be determined from the telehealth connection. Speech functions were appropriate for tone, volume, rate, and fluency, with no evidence of pressured patterns or of any expressive or receptive language dysfunction. Thought processes were intact, goal oriented, logical, and well organized. Thought content revealed no evidence of delusions, obsessions, rumination, grandiosity, suspiciousness, phobia, paranoia, negativistic thinking or for any SI or HI. There was no evidence of any perceptual disturbances. Memory functions were intact with respect to immediate, recent, and remote memories. Attention and concentration were without obvious impairment. Insight and judgment appeared to be intact.

(R. 2432.)

Plaintiff's April 22, 2020 mental status exam stated:

Client was seen via telehealth. [Plaintiff] was dressed in casual attire and appropriately groomed. Despite being in pain, her attitude was open and cooperative. Mood was euthymic, with affect reactive and congruent to the topic of conversation. Eye contact was within normal limits, as could be determined from the telehealth connection. Speech functions were appropriate for tone, volume, rate, and fluency, with no evidence of pressured patterns or of any expressive or receptive language dysfunction. Thought processes were intact, goal oriented, logical, and well organized. Thought content revealed no evidence of delusions, obsessions, rumination, grandiose, suspiciousness, phobia, paranoia, negativistic thinking or for any SI or HI. There was no evidence of any perceptual disturbances. Memory functions were intact with respect to immediate, recent, and remote memories. Attention and concentration were without obvious impairment. Insight and Judgment appeared to be intact.

(R. 2434.)

Plaintiff's April 29, 2020 mental status exam reported as follows:

Client was seen via telehealth. [Plaintiff] was dressed in casual attire and appropriately groomed. Her attitude was open and cooperative. Mood was euthymic, with affect reactive and congruent to the topic of conversation. Plaintiff did state however, that she has felt "more depressed this week," sleeping 12 hours last night. Eye contact was within normal limits, as could be determined from the telehealth connection. Speech functions were appropriate for tone, volume, rate, and fluency, with no evidence of pressured patterns or of any expressive or receptive language dysfunction. Thought processes were intact, goal oriented, logical, and well organized. Thought

content revealed no evidence of delusions, obsessions, rumination, grandiosity, suspiciousness, phobia, paranoia, negativistic thinking or for any SI or HI. There was no evidence of any perceptual disturbances. Memory functions were intact with respect to immediate, recent, and remote memories. Attention and concentration were without obvious impairment. Insight and judgment appeared to be intact.

(R. 2435.)

Plaintiff's May 8, 2020 mental status exam reported:

Client was seen via telehealth. [Plaintiff] was still in bed when the session started, but got up and combed her hair during the session. Her attitude was open and cooperative. Mood was euthymic, with affect reactive end congruent to the topic of conversation. Eye contact was within normal limits, as could be determined from the telehealth connection. Speech functions were appropriate for tone, volume, rate, and fluency, with no evidence of pressured patterns or of any expressive or receptive language dysfunction. Thought processes were intact, goal oriented, logical, and well organized. Thought content revealed no evidence of delusions, obsessions, rumination, grandiosity, suspiciousness, phobia, paranoia, negativistic thinking or for any SI or HI. There was no evidence of any perceptual disturbances or psychotic processes. Memory functions were intact with respect to immediate, recent, and remote memories. Attention and concentration were without obvious impairment. Insight and judgment appeared to be intact, with insight demonstrated through her awareness of self and others in a relational context.

(R. 2436.)

Plaintiff's May 26, 2020 mental status exam showed:

Client was seen via telehealth. [Plaintiff] was casually dressed and appropriately groomed. Her attitude was open and cooperative. Mood was euthymic, with affect reactive and congruent to the topic of conversation. Eye contact was within normal limits, as could be determined from the telehealth connection. Speech functions were appropriate for tone, volume, rate, and fluency, with no evidence of pressured patterns or of any expressive or receptive language dysfunction. Thought processes were intact, goal oriented, logical, and well organized. Thought content revealed no evidence of delusions, obsessions, rumination, grandiosity, suspiciousness, phobia, paranoia, negativistic thinking or for any SI or HI. There was no evidence of any perceptual disturbances or psychotic processes. Memory functions were intact with respect to immediate, recent, and remote memories. Attention and

concentration were without obvious mpairment. Insight and judgment appeared to be intact, with insight demonstrated through her awareness of self and others in a relational context.

(R. 2437.)

Plaintiff's June 19, 2020 mental status exam reported as follows:

Client was seen via telehealth. [Plaintiff] was casually dressed and appropriately groomed. Her attitude was open and cooperative. Mood was euthymic, with affect reactive and congruent to the topic of conversation. Eye contact was within normal limits, as could be determined from the telehealth connection. Speech functions were appropriate for tone, volume, rate, and fluency, with no evidence of pressured patterns or of any expressive or receptive language dysfunction. Thought processes were intact, goal oriented, logical, and well organized. Thought content revealed no evidence of delusions, hallucinations, rumination, grandiosity, suspiciousness, phobia, paranoia, negativistic thinking or for any SI or HI. There was no evidence of any perceptual disturbances or psychotic processes. Memory functions were intact with respect to immediate, recent, and remote memories. Attention and concentration were without obvious impairment. Insight and judgment appeared to be intact, with insight demonstrated through her awareness of self and others in a relational context.

(R. 2438.)

Dr. Johnson completed a mental medical source statement for Plaintiff in September 2019. (R. 1917-20.) Dr. Johnson opined in relevant part that Plaintiff had the following limitations: extreme limitations in the ability to maintain attention and concentration for more than two-hour segments, sustain an ordinary routine without special supervision, make simple work-related decisions, and complete a normal work day and work week without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (R. 1918.) He opined that Plaintiff had marked limitations in the ability to understand and remember detailed instructions, carry out detailed instructions, perform activities

within a schedule, maintain regular attendance, and be punctual within customary tolerances, respond appropriately to changes in the work setting, travel in unfamiliar places or use public transportation, set realistic goals or make plans independently of others, and tolerate normal levels of stress. (R. 1918.) He opined that Plaintiff had moderate limitations in the ability to remember locations and work-like procedures, carry out very short and simple instruction, interact appropriately with the general public, "accept instructions and respond appropriately to criticism from supervisors, maintain social-appropriate behavior" and adhere to basic standards of neatness and cleanliness, and be aware of normal hazards and take appropriate precautions; no or mild limitations in the ability to understand and remember very short and simple instructions, "work in coordination with or proximity to others without being distracted by them, ask simple questions or request assistance," and "get along with coworkers or peers without distracting them of exhibiting behavioral extremes." (R. 1918.)

Plaintiff saw her primary care provider, Lee Ann Bera, MD in July 2019, who noted:

> She requested a medical opinion form about her ability to work. She has been off of work for the past year due to pain issues. She also states that she has very injury prone and this makes it difficult for her to work. She states that in her daily life she keeps quite active, participates in gardening with her grandmother. She is able to do this work because she is able to stop and rest as needed. I do feel that she would be able to perform limited work with restrictions if she is able to find an employer to accommodate these restrictions. She is concerned she may not be able to find an employer that would be able to accept accommodations. She has previously seen a job coach and done vocational rehab, and I encouraged her to get reconnected with job coach to see if they may be able to help her find a suitable employer. Offered social work consult as well but she declined. I filled out the medical opinion form stating that starting September 1 she would be able to work 4-

25

hour days but should be allowed to rest as needed and should stand and sit only for maximum of 30 minutes at a time before having a break.

(R. 2011.)

Dr. Bera saw Plaintiff in October 2019 and Plaintiff reported that she was a cashier at Family Pathways but was having a hard time dealing with work restrictions. (R. 2037.)  The progress notes report:

> [Plaintiff] states that she is trying to find another job. She says they are not treating her well since she gave them her restriction letter- they are accommodating this but not happy about it. Says that whenever she uses the stool, it is reported to her manager. She is working 12-18 hours per week, 6-10 hours shifts. She wants to keep with the same restrictions, but has an accommodation form that her work needs in addition to the letter that was provided. They want her to work in the back as well as cashier, which will involve lifting up to 75 pounds with some frequency, which she is not able to do. She is able to lift up to that much, but not frequently.

(R. 2038.)

Plaintiff saw Ann Gershone, DNP in August and September 2019.  (R. 2392-99.) Dr. Gershone prescribed Plaintiff with Guanfacine[9] to help with focus, and on September 13, 2019, Plaintiff reported that the medicine was "working very well" and that she was "able to stop and think before talking" and that "everyone around her has noticed how she is more focused."  (R. 2398.)

From August 2019 through May 2020, Plaintiff continued to receive ARMHS services from various providers at Nystrom & Associates, as well as Behavioral Health Home Services (BHH).  (R. 2298-2391.)  During a September 2019 appointment,

---

[9]    Guanfacine is a medication commonly used to treat ADHD. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2526381/ (last visited July 10, 2024).

Plaintiff reported: "Client also reports getting fired from her job today because they didn't accommodate her restrictions of needing a stool during her 8 hour work day."  (R. 2376.)

In November 2019, Plaintiff's mental status examination showed: she had an appropriate, anxious, fearful/vigilant and preoccupied affect; she had an appropriate, depressed, anxious, and pleasant mood; she had labile stability; she was fully cooperative; she reported experiencing insomnia; she was disoriented, she had fair attention and good insight but poor short and long term memory; she was employed 12-20 hours a week; she reported visual and auditory hallucinations; and she reported no delusions but experienced racing thoughts and flight of ideas.  (R. 2363.)

During a December 2019 assessment, Plaintiff's social life domain update stated:

Strengths: [Plaintiff] reports being an admin on a harry potter [sic] web site that gives her the opportunity to interact with others. client's hobbies include, reading, writing, watching movies, playing with [cat], and crafts.

Barriers: Client reports that her history of trauma and depression makes it difficult to trust people or be open to new friendships and therefor[e] a barrier. [Plaintiff] has distanced herself from a friend in her apartment.

(R. 2346.)

In February 2020 Plaintiff reported to her ARMHS therapist: "Client reports that she spent most of Wednesday in the ER after tripping in the gas station parking lot. Client reports that it was a sprain. Client reports that she is out of work next week and supposed to be using crutches."  (R. 2333.)

In March 2020 Plaintiff reported to a BHH provider,

Client is currently waiting for a court date to appeal their SSI decision. Client reported that they were fired from their job due to their work not being able to compensate their boot. Client further reports that they are not looking for a job because they are due for surgery on April 17th. Client also reports that their GA is in the work [sic]. They state they were kicked off their GA from their primary doctor because the doctor wanted them to get a job.

(R. 2326.)

In April 2020 Plaintiff reported to mental health providers:

Staff and Client Actions: SN met with client and ARMHS worker for a joint appointment. BHH started the check-in with talking about employment. Client states that they are not interested in seeking other employment because they feel they are not able to keep a job. Client also reports issues with a work comp. case. SN recommended that client email and call worker's comp. If they do not hear back in a week then BHH will step in. Client reports getting their stimulus check. They bought a vacuum, paid off their energy bill, and plans on renting a carpet cleaner. Client reports 30 days of non-smoking. Client spoke about being diagnosed with autism. No official testing has been done. BHH & ARMHS provider filled out disability paperwork.

(R. 2319.)

In April 2020, Plaintiff was assessed by Neil Greco, LSW who opined Plaintiff's mental health status was oriented to time, person, place, and situation; normal rate and rhythm of speech but also excessive speech; cooperative and normal attitude and mood; appropriate affect and logical thoughts content; and focused attention span/concentration. (R. 2308-09.) In May 2020, Plaintiff reported that she was managing a Harry Potter Group, though she said she might step down due to not having enough time. (R. 2301.) Again, Plaintiff continued to receive ARMHS progress notes that showed that she was "pleasant and cooperative" throughout each session. (*See* R. 2305, 2314, 2320, 2325, 2330, 2340, 2351, 2369, 2378, 2387.)

The State Medical Review Team from the Minnesota Department of Human Services did an Adult Psychological Disability Case Rationale in March 2020 and opined that Plaintiff would be able to tolerate brief, infrequent, and superficial contact with others.  (R. 1940.)

Morgan Krause, Psy.D conducted a psychological evaluation of Plaintiff from Canvas Health's Neurodevelopment Disorders Clinic on June 12, 2020.  (R. 2440-50.) Dr. Krause made the following observations of Plaintiff's mental status and behavior:

> [Plaintiff] arrived on time for her scheduled appointment. She presented as appropriately groomed and dressed and was oriented to person, place, time, and situation. She denied any hallucinations or delusions. [Plaintiff] was observed to speak in metaphors during multiple occasions throughout the interview, specifically when she was asked open-ended questions that may have been more ambiguous in nature. At one point, she made comments about this evaluator's mannerisms and followed up those comments by pointing out how much effort she puts into monitoring others in social situations. She spoke with enthusiasm and her affect was labile, consistent with the content of her speech. Her speech was somewhat quickened in pace, though not pressured. [Plaintiff] reported some impairments in memory, specifically surrounding childhood experiences. She demonstrated some impairments to concentration and attention. She was physically active during the interview. She stood and walked around the room on two occasions and once used sanitizing wipes to clean her surroundings. She was also observed to rock slightly in her chair during portions of the interview. During testing, [Plaintiff] often took her time in answering questions and appeared to give full effort on all tasks. As such, these results are likely an accurate representation of her current functioning.

(R. 2440-41.)  Dr. Krause diagnosed Plaintiff with Autism Spectrum Disorder, Major Depressive Disorder, Generalized Anxiety Disorder, PTSD, ADHD, and recommended that Plaintiff work with a vocational service "to find a job that is appropriate for her current needs."  (R. 2448-49.)

The record contains treatment notes showing that Plaintiff continued to see Dr. Johnson from June 2020 through August 2021. (R. 3415-3502.) Plaintiff's June 19, 2020 mental status exam stated:

> Client was seen via telehealth. [Plaintiff] was casually dressed and appropriately groomed. Her attitude was open and cooperative. Mood was euthymic, with affect reactive and congruent to the topic of conversation. Eye contact was within normal limits, as could be determined from the telehealth connection. Speech functions were appropriate for tone, volume, rate, and fluency, with no evidence of pressured patterns or of any expressive or receptive language dysfunction. Thought processes were intact, goal oriented, logical, and well-organized. Thought content revealed no evidence of delusions, obsessions, rumination, grandiosity, suspiciousness, phobia paranoia, negativistic thinking or for any SI or HI. There was no evidence of any perceptual disturbances or psychotic processes. Memory functions were intact with respect to immediate, recent, and remote memories. Attention and concentration were without obvious impairment. Insight and judgment appeared to be intact, with insight demonstrated through her awareness of self and others in a relational context.

(R. 3476.)

Thereinafter, Plaintiff's mental status exams by Dr. Johnson remained largely consistent with the prior mental status exam between June 2020 through August 2021. (*See, e.g.*, R. 3477 (mood mildly agitated), 3478 (mood anxious), 3479, 3480, 3482, 3483, 3484, 3485, 3486 (mood anxious), 3488 (mood anxious and easily distracted), 3489 (mood anxious and easily distracted), 3490, 3491, 3493, 3494 (mood elevated and attention/concentration variable), 3495 (mood agitated ), 3497 (mood depressed), 3498 (mood depressed), 3499 (mood mildly depressed), 3500, 3416-47 ("no significant changes reported or observed").)

A June 17, 2021 diagnostic assessment by Dr. Johnson stated:

> Plaintiff is not working. She worked for approximately 7 months in 2019 doing cashier work for a Family Pathways Thrift store. She worked part-time. Previous to this she worked for two weeks at a McDonalds a number of years ago, and before that, worked for two years at Grand Casino in Hinckley, MN. She has held 6 jobs since the age of 16.

(R. 3454.)  She had no interest in partnering for jobs and stated that her "mental health and/or substance abuse" had caused difficulties in sustaining employment.  (R. 3454.)

The record also shows that Plaintiff was consistently gardening, often with her grandmother.  (R. 2302, 2303, 2315, 2326, 2337.)  Plaintiff also socialized with online friends.  (R. 2335-36.)

### III.    VOCATIONAL EXPERT'S TESTIMONY

ALJ McLaughlin obtained some testimony from VE Jo Ancell at the October 6, 2021 hearing.  (R. 283-95.)  However, ALJ McLaughlin terminated that hearing during Plaintiff's lawyer's examination of VE Ancell, leaving the testimony incomplete.  (R. 294-95; *see also* R. 14 ("There was an initial hearing held on October 6, 2021 followed by a supplemental hearing on February 24, 2022.  The supplemental hearing was necessary in order to complete testimony from the vocational expert.").)

Then, on February 24, 2022, ALJ Morrow held a supplemental hearing to complete the testimony from a vocational expert, VE Heather Mueller.  (R. 14; R. 325-36.)  During the February 24, 2022 hearing, ALJ Morrow asked VE Mueller the following question:

> Q  Ms. Mueller, for my first hypothetical, please consider an individual with the claimant's age, education, and work experience. The individual can perform at the light exertional level with the following limitations: Occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, occasionally balance, stoop, kneel, crouch and crawl, frequently reach,

handle, finger, and feel with the bilateral upper extremities. The individual requires the ability to alternate between sitting and standing every 30 minutes for 1 to 2 minutes in the immediate vicinity of the workstation. The individual can work in an environment with no more than a moderate noise level as defined by the Selected Characteristics of occupations. The individual can never be exposed to concentrated levels of extreme heat, extreme cold, fumes, odors, dust, gases, poor ventilation or other pulmonary irritants and can never be exposed to flashing lights, strobe lighting, or hazards such as moving machinery, unprotected heights, or commercial driving. The individual can perform simple routine and repetitive tasks but not at a production-rate pace, so for example, no assembly line work. The individual can respond appropriately to occasional supervision-- oh, I'm sorry -- to occasional superficial interaction with supervisors, coworkers, and the general public with superficial defined as interaction limited to supervisor or instructional matters. **However the individual is able to interact sufficiently to complete the 30-day training period**. The individual can tolerate few changes in the work setting defined as routine job duties that remain static and are performed in a stable predictable work environment.

(R. 331-32 (emphasis added).) ALJ Morrow then asked, "Could such an individual perform the claimant's past work?" (R. 332.) The VE responded: "No, the past work is eliminated." (R. 332.)

ALJ Morrow then asked if there would be any other jobs that such an individual could perform, and VE Mueller responded:

> Yes. So we would have work as a circuit board assembler, DOT is #726.684-110, sedentary, SVP 2, with national numbers of 34,000. There would be work as an address clerk, DOT #209.587-010, light -- or not -- sorry, light but sedentary SVP 2, with national numbers of 12,000, and there would be work as a document preparer, DOT #249.587-018, sedentary, SVP 2, with national numbers of 46,000.

(R. 332-33.) Plaintiff's counsel questioned VE Mueller during the remand hearing, but not about the 30-day training period. (R. 334-35.)

## IV.    LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g), or if the ALJ's decision resulted from an error of law, *Nash v. Comm'r, Soc. Sec. Administration*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g) and *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018)).  "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusions."  *Id.* (quoting *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007)).  The Court "considers evidence that detracts from the Commissioner's decision as well as evidence that supports it."  *Id.*  "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome."  *Id.* (citation omitted).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ.  *See Hilkemeyer v. Barnhart*, 380 F.3d 441, 445 (8th Cir. 2004).  Assessing and resolving credibility is a matter properly within the purview of the ALJ.  *See Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (citing *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003) ("Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide.").

When conducting its "limited and deferential review of the final agency determination under the substantial-evidence standard," the Court "must view the record in the light most favorable to that determination."  *Chismarich v. Berryhill*, 888 F.3d

978, 980 (8th Cir. 2018).  The Court "must strive to harmonize statements where possible" and "may neither pick nits nor accept [a plaintiff]'s invitation to rely upon perceived inconsistencies." *Id.*

Under the Act, disability is defined as the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  *Id.* § 423(d)(3).

"A disability claimant has the burden to establish her RFC."  *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).  The Eighth Circuit has held that "a 'claimant's residual functional capacity is a medical question.'"  *Id.* (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)).  "'[S]ome medical evidence' must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace.'"  *Id.* (quoting *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam)).  However, "there is no requirement that an RFC finding be supported by a specific medical opinion."  *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citing *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012)).  Rather, the RFC should be "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his

34

limitations." *Id.* (quoting *Myers*, 721 F.3d at 527). Indeed, "[e]ven though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Perks*, 687 F.3d at 1092 (quoting *Cox*, 495 F.3d at 619-20) (citations omitted).

## V.    DISCUSSION

Plaintiff raises one issue on appeal, that "the ALJ's residual functional capacity does not accurately reflect the medical opinion that it was based on." (Dkt. 16 at 6.) However, based on the arguments in Plaintiff's brief, it is clear that Plaintiff is actually arguing that the mental component of the RFC was not supported by substantial evidence. (*See generally id.*) Plaintiff appears to challenge two aspects of the RFC: (1) the conclusion that Plaintiff "was limited to occasional and superficial interaction with others" where "superficial" was defined as "interaction limited to supervisory or instructional matters," which Plaintiff views as inconsistent with the state agency psychologists' opinions; and (2) the ALJ's inclusion that Plaintiff "could interact with others to sufficiently complete the 30-day training period." (*Id.*) According to Plaintiff, the mental RFC is not supported by any evidence in the record and that "the ALJ essentially took on the role of doctor by declaring when [Plaintiff's] social functioning limitations would be applicable." (*Id.*)

ALJ Morrow assessed Plaintiff's mental RFC as follows:

She can perform simple, routine, and repetitive tasks, but not at a production rate pace, so for example, no assembly line work; and can respond appropriately to occasional, **superficial** interaction with supervisors, co-workers and the general public (with superficial defined as interaction limited to supervisory or instructional matters). However, the individual is

able to interact sufficiently to complete a 30-day training period. She can tolerate few changes in the work setting, defined as routine job duties that remain static and are performed in a stable, predictable work environment.

(R. 24-25 (emphasis added).)

The Court first addresses Plaintiff's arguments relating to the 30-day training period and then turns to Plaintiff's arguments based on the ALJ's use of "superficial" in the mental RFC and treatment of the state agency psychologists' opinions.

**A.    30-Day Training Period**

The mental RFC states that: Plaintiff "[c]can respond appropriately to occasional, superficial interaction with supervisors, co-workers and the general public (with superficial defined as interaction limited to supervisory or instructional matters)." (R. 24-25.) It then states: "However, the individual is able to interact sufficiently to complete a 30-day training period." (R. 25.) Plaintiff argues that the "However" sentence relating to "a 30-day training period" was ALJ Morrow "simply declar[ing] that Plaintiff's social functioning limitations would basically not apply during the 30-day training period." (Dkt. 16 at 8.) Plaintiff argues the exclusion of the 30-day training period from the RFC's limitations of "occasional, superficial interactions" created an "exception" to the social interaction limitations that is unexplained and unsupported by the record. (Dkt. 16 at 8; Dkt. 19 at 3-4.) Plaintiff contends that the 30-day training period statement is not a limitation, but rather an instruction to the VE. (Dkt. 19 at 5.) Finally, Plaintiff argues that the ALJ inappropriately took on the role of a medical expert or provider in creating that exclusion. (Dkt. 16 at 9.)

The Commissioner counters that there is no inconsistency between the two statements.  (Dkt. 18 at 12.)  According to the Commissioner: ALJ Morrow "did not carve out a possible 30-day training [period] for a different type of interaction.  Instead, Plaintiff's social abilities, as the ALJ defined them, would be the same whether Plaintiff was training or had undertaken post-training duties."  (*Id*.)  According to the Commissioner: "Plaintiff's social abilities, as the ALJ defined them, would be the same whether Plaintiff was training or had undertaken post-training duties."  (Dkt. 18 at 12.) The Commissioner continues that ALJ Morrow's definition of superficial interaction as limited to supervisory or instructional matters, "is precisely the type of interaction most needed during training."  (Dkt. 18 at 12.)

No party addressed the origin of the 30-day training period language in the RFC.[10] Given that the jobs identified by VE Mueller at the February 22, 2022 hearing were all Specific Vocational Preparation (SVP) -2 jobs (R. 36), the Court understands this 30-day training period to refer to "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation," which is "up to and including 1 month" for SVP-2 jobs, *see* DOT, Appendix C, Components of the Definition Trailer, 1991 WL 688702 (4th ed. 1991).

---

[10]    The Court notes that the examination that prompted ALJ McLaughlin's termination of the October 6, 2021 hearing related to the interaction needed in terms of "training, coaching, criticism, job direction, and things of that nature."  (R. 293-94.)

The parties disagree as to whether the statement "However, the individual is able to interact sufficiently to complete a 30-day training period" is an exception to the immediately preceding statement limiting Plaintiff "to occasional, superficial interaction with supervisors, co-workers and the general public (with superficial defined as interaction limited to supervisory or instructional matters)." (*Compare* Dkt. 19 at 4 ("The ALJ's inclusion of the 30-day training period exception was reason enough to warrant a remand."), *with* Dkt. 18 at 12 ("The ALJ did not carve out a possible 30-day training for a different type of interaction.").) According to the Commissioner:

> The ALJ defined superficial as interaction limited to supervisory or instructional matters, which is precisely the type of interaction most needed during training. If the ALJ had wanted to say her defined superficial interaction would not apply during training, she could have done so. Instead, she defined superficial to include the training period when supervision and instruction might be temporarily greater or more focused than when Plaintiff learned her duties. This is a reasonable interpretation and not post hoc rationalization.

(Dkt. 18 at 12.) The Commissioner further argues that "Plaintiff's social abilities, as the ALJ defined them, would be the same whether Plaintiff was training or had undertaken post-training duties." (*Id.*)

Here, the ALJ used the word "However" to begin a statement about Plaintiff's social interaction capacity during a 30-day training period immediately after a statement limiting Plaintiff's social interaction capacity in general. The word "however" is commonly used to indicate a contrast. *See However*, THE BRITANNICA DICTIONARY, https://www.britannica.com/dictionary/however (last visited July 10, 2024) ("used when you are saying something that is different from or contrasts with a previous statement").

The Court recognizes the Eighth Circuit's general direction to harmonize rather than pick apart the ALJ's statements. *See Chismarich*, 888 F.3d at 980. However, the Court cannot read the word "however" in this context as anything other than creating an exclusion. If Plaintiff's social capacity was the same during a 30-day training period as it was otherwise, the ALJ would have no need to call out and specify her capacity during that training period.[11]

Furthermore, the Commissioner's "reasonable explanation" ignores the meaning of the word "however" and does not address the "able to interact sufficiently to complete a 30-day training period" language. Indeed, it is unclear what "interact sufficiently" means in this RFC because there is no indication of what "sufficiently" requires. In sum, the Court cannot harmonize its way out of a plain reading of two consecutive statements in the RFC, and none of the cases cited on page 13 of the Commissioner's brief permit the Court to do so. (*See* Dkt. 18 at 13 (citing *Bentley v. Kijakazi*, 2023 WL 3862562, at *1 (8th Cir., Jun. 7, 2023) (affirming ALJ's treatment of a medical opinion); *Galloway v. Kijakazi*, 46 F.4th 686, 690 (8th Cir. 2022) (harmonizing statement in ALJ's decision that "the opinion that the claimant has marked findings in understanding and remembering

---

[11]    The Commissioner argues that the ALJ "defined superficial to include the training period when supervision and instruction might be temporarily greater or more focused than when Plaintiff learned her duties." (Dkt. 18 at 12.) This is based on the argument that training requires supervisory and instructional matters and therefore the ALJ's "definition" of "superficial" includes training. (*Id.*) This is the type of post hoc rationalization in which the Court may not engage. *See Ronald V. v. Kijakazi*, No. 22-CV-2140 (TNL), 2023 WL 6318276, at *6 (D. Minn. Sept. 28, 2023) ("[T]he ALJ's decision cannot be sustained on the basis of the post-hoc rationalizations of appellate counsel.") (collecting cases).

detailed instructions and carrying out detailed instructions is not necessarily pertinent

because the claimant is limited to simple, unskilled work" with "the ALJ's hypothetical

question and the residual functional capacity determination"); *Weise v. Kijakazi*, 2022

WL 1284245, at *18 (N.D. Iowa Feb. 15, 2022) (finding certain pages in the record were

not part of a "separate opinion" that the ALJ did not analyze)).)

The Court turns to the effect of this 30-day training exclusion. Plaintiff argues this

exclusion is unsupported by the record and the ALJ erred in providing no explanation for

the exclusion. (Dkt. 16 at 8-9.) In *Clampit v. Comm'r of Soc. Sec.*, the ALJ assigned

Clampit the following RFC:

> During a training period of up to 30 days, capable of occasional interaction
> with coworkers and supervisors. After the training period limited to brief and
> superficial occasional interactions with the general public. Superficial
> defined as, able to be in proximity of others, able to exchange greetings, and
> able to engage in discussions that do not require persuasion, or involve
> tandem tasks.

No. 3:22CV1561, 2023 WL 2958158, at *5-6 (N.D. Ohio Mar. 30, 2023), *R. & R.*

*adopted*, 2023 WL 2956613 (N.D. Ohio Apr. 14, 2023). The *Clampit* court explained

that "other courts have reversed where, as here, the ALJ does not provide an explanation

for making a distinction in abilities before and after a training period." *Id.* at *6

(collecting cases). Following those cases, the *Clampit* court reversed and remanded for

further proceedings "[b]ecause the ALJ failed to explain his reasoning or the evidence

supporting his decision to make a distinction between Clampit's abilities before and after

the training period." *Id.*

In contrast, in *Jess B. v. Kijakazi*,

> The ALJ provided a reasonable explanation for allowing the Plaintiff "more than occasional contact with supervisors for the brief training period" – noting that it is logical that one would have more contact with a supervisor when starting a new job, and that the medical evidence demonstrated "largely unremarkable examination findings, including cooperative and normal behavior."

No. 2:23-CV-00007, 2023 WL 6457322, at *9 (S.D.W. Va. Aug. 21, 2023), *R. & R. adopted*, No. 2:23-CV-00007, 2023 WL 6449442 (S.D.W. Va. Oct. 3, 2023). This meant the court was "not left to speculate how the ALJ included the provision that the Plaintiff could tolerate 'more than occasional' cont[]act during his training period, allowing for meaningful judicial review." (*Id.* (citing *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015)).

It is true that ALJ Morrow reviewed the record relating to Plaintiff's psychological conditions in detail. (*See, e.g.*, R. 29-32.) But the ALJ did not articulate any reason for the distinction in Plaintiff's capacity to interact during a 30-day training period and outside of that period. There may well be reasons why Plaintiff could have the capacity to "interact sufficiently to complete a 30-day training period," but the Court cannot engage in post hoc rationalizations to support that conclusion. *See, e.g.*, *Susan H. v. Kijakazi*, No. 21-CV-2688 (ECT/ECW), 2023 WL 2142786, at *3 (D. Minn. Feb. 21, 2023) ("In the absence of any explanation from the ALJ, I cannot determine whether the ALJ's decision is supported by substantial evidence on the record, and the matter should be remanded for that analysis."). The Court therefore recommends remand for purposes of clarifying Plaintiff's mental RFC during a 30-day training period and the bases for that

RFC and, if necessary, obtaining relevant testimony from a VE as to the step five analysis.

**B.    The ALJ's Use of "Superficial" and Treatment of the State Agency Psychologists' Opinions**

Plaintiff argues that the definition of "superficial" in the RFC "does not accurately reflect" the state agency psychologists' opinions, even though ALJ Morrow found the opinions "generally persuasive." (Dkt. 16 at 6 (citing R. 33).) Plaintiff argues that ALJ Morrow's resulting definition of "superficial" was "arbitrary" and that ALJ Morrow "added qualifiers without providing any support or explanation as to why." (*Id.*; *see also* Dkt. 19 at 3.)

The Commissioner counters that no conflict exists between ALJ Morrow's finding that the state agency psychologists' opinions were "generally persuasive" and ALJ Morrow's definition of "superficial" as limited to supervisory or instructional matters, even though the state agency psychologists did not provide a definition for the term "superficial." (Dkt. 18 at 6-7.) The Commissioner argues further that ALJ Morrow's definition was not arbitrary because it added "clarity and greater restrictions to Plaintiff's" RFC, that Plaintiff cannot show harm because ALJ Morrow found greater limitations than the state agency psychologists, and that any difference between the definitions of the term "superficial" are resolved by ALJ Morrow's more restrictive definition. (*Id.*) The Commissioner continues that the definition is not arbitrary because it connected Plaintiff's mental abilities with work-related limitations and because ALJ

Morrow, not the state agency psychologists, is "charged with making the residual functional capacity finding." (*Id.* at 7-8.)

The first state agency psychologist, P.E. Shields, Ph.D, L.P., reviewed Plaintiff's records in June 2019 and the second, Marci Mylan, Ph.D, L.P., reviewed Plaintiff's records in August 2019. (R. 352, 393.) Both concluded that Plaintiff had the following mental RFC: Plaintiff was not significantly limited in the ability to carry out very short and simple instructions; the ability to carry out detailed instructions; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to work in coordination with or in proximity to others without being distracted by them; the ability to sustain an ordinary routine without special supervision; and the ability to make simple work-related decisions. (R. 351, 391-92.) Both state agency psychologists further opined that Plaintiff was moderately limited in the ability to maintain attention and concentration for extended periods; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. 351, 392.) They both opined that Plaintiff "retains the ability to concentrate and attend to 3-4 step tasks" and "would have moderate limitations for detailed, complex and technical tasks." (R. 351, 392.)

As to Plaintiff's social interaction limitations, both state agency psychologists assessed Plaintiff's social interaction limitations as follows: not significantly limited in the ability to ask simple questions or request assistance, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and to maintain socially

appropriate behavior and to adhere to basic standards of neatness and cleanliness. (R. 352, 392.) Both opined that Plaintiff was moderately limited in the ability to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors. (R. 352, 392.) Both state agency psychologists opined that Plaintiff "retains the ability to tolerate **superficial** interactions with coworkers, supervisors and the public" and **"[i]n this context she can tolerate ordinary levels of supervision**." (R. 352, 392 (emphases added).)

> ALJ Morrow stated as to the state agency psychologists' opinions:

> In terms of the mental residual functional capacity, the opined 3-4 step task preclusion is overly restrictive in light of the WAIS-IV intellectual test results, and is inconsistent with these and the lack of cognitive findings on mental status exams. The undersigned elaborated on the State Agency psychological consultant opinions and made them more restrictive and more clearly defined. Otherwise, the mental opinions are well supported and generally consistent with the neurocognitive findings, intermittent mood and anxiety findings, and inconsistent other findings on the mental status exams. They are generally persuasive (Exs. 1A, 2A, 7A, 8A).

(R. 32-33.)

Plaintiff is correct that ALJ Morrow found the state agency consultants' opinions "generally persuasive," although ALJ Morrow stated that she made the RFC "more restrictive and more clearly defined." (R. 33.) A careful review of the RFC and the state agency psychologists' opinions shows this to be true in almost every sense. The only mental RFC determination that ALJ Morrow made less restrictive than the state agency consultants' opinions was her conclusion that it was overly restrictive to limit Plaintiff to 3-4 step tasks, and ALJ Morrow based this conclusion on the WAIS-IV intellectual test results. (R. 33.) Plaintiff does not challenge the conclusion.

Otherwise, ALJ Morrow's conclusion that Plaintiff "can respond appropriately to occasional, **superficial** interaction with supervisors, co-workers and the general public (with superficial defined as interaction limited to supervisory or instructional matters)" (R. 24-25 (emphasis added)) is markedly similar to the state agency psychologists' conclusions that: Plaintiff "retains the ability to tolerate **superficial** interactions with coworkers, supervisors and the public.  In this context she can tolerate ordinary levels of supervision."  (R. 352, 392 (emphasis added).)  Unlike the Commissioner's argument with respect to the "however" clause of to the 30-day training period, the ALJ's statement of the mental RFC in view of her statement that the incorporation of the state agency psychologists' opinions were "generally persuasive" are the type of statements that a reviewing court can and should harmonize rather than pick apart.  *See Chismarich*, 888 F.3d at 980 ("[W]e must strive to harmonize statements where possible; we may neither pick nits nor accept an appellant's invitation to rely upon perceived inconsistencies."); *see also Lane v. O'Malley*, No. 23-1432, 2024 WL 302395, at *1 (8th Cir. Jan. 26, 2024) ("We reject this manufactured inconsistency.  The psychologists noted that Lane could relate to others superficially, work in small groups, and maintain at least minimal relationships with others.  Nothing in the reference to 'occasional' interactions conflicts with that opinion.  And the ALJ, considering the entire record, addressed the quality of Lane's workplace interactions: no team, tandem, or public-facing work.  We decline to nitpick its well-reasoned decision.").

Likewise, the Court rejects Plaintiff's argument that ALJ Morrow "arbitrarily defined the term superficial."  (Dkt. 16 at 6.)  Rather, it appears that ALJ Morrow

narrowed the meaning of "superficial," thereby imposing a more restrictive RFC that the state agency psychologists, which results in no prejudice to Plaintiff and is ultimately harmless. *See Hamer v. Colvin*, No. 4:14 CV 1371 JMB, 2015 WL 6750820, at *8 (E.D. Mo. Nov. 5, 2015) ("[T]he fact that the ALJ ultimately imposed greater limitations on Plaintiff's RFC resulted in no prejudice to Plaintiff. Thus, the fact that the ALJ relied on an opinion that included fewer restrictions on Plaintiff's RFC amounts to no more than a harmless error in opinion writing technique." (citing *Byes v. Astrue*, 687 F.3d 913, 918 (8th Cir. 2012); *Hepp v. Astrue*, 511 F.3d 798, 806 (8th Cir. 2008))). Again, the ALJ's assessment of the mental RFC in this regard should be harmonized with the "generally persuasive" state agency psychologists' opinions, not picked apart. *See Chismarich*, 888 F.3d at 980; *Lane*, 2024 WL 302395, at *1.

Finally, as the Commissioner argues, it is well-established that while "the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner," *Perks*, 687 F.3d at 1092 (quoting *Cox v. Astrue*, 495 F.3d 614, 619-20 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006))), and "there is no requirement that an RFC finding be supported by a specific medical opinion," *Hensley*, 829 F.3d at 932. Having reviewed the entire record, the Court finds the mental RFC determination (except for the 30-day training period) is supported by substantial evidence, including the opinions of the state agency psychologists, the voluminous record as to Plaintiff's mental health treatment, and the record relating to her interactions with others. The Court therefore recommends denial of

Plaintiff's motion insofar as it challenges ALJ Morrow's treatment of the state agency psychologists' opinions.

* * *

For the reasons stated above, the Court recommends that Plaintiff's request for reversal or remand of the Commissioner's decision be granted and the Commissioner's request that the Court affirm the Commissioner's decision be denied.

## VI.    RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS RECOMMENDED THAT**:

1.      Plaintiff's request for reversal or remand of the Commissioner's decision (Dkt. 16) be **GRANTED in part** and **DENIED in part** as set forth above;

2.      This case be **REMANDED** for the purpose of clarifying Plaintiff's mental RFC during a 30-day training period and the bases for that RFC and, if necessary, obtaining relevant testimony from a VE as to the step five analysis; and

3.      The Commissioner's request that the Court affirm the Commissioner's decision (Dkt. 18) be **DENIED**.

DATED:  July 10, 2024                    *s/Elizabeth Cowan Wright*
                                         ELIZABETH COWAN WRIGHT
                                         United States Magistrate Judge

## NOTICE

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within

14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).